UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONDIGO, LLC, a Michigan limited liability
company, DOLORES MICHAELS aka
NICOLINA A. MICHAELS and
RENEE MICHAELS,

       Plaintiffs,                         Case Number: 08-10432

v.                                     DISTRICT JUDGE JOHN FEIKENS
TOWNSHIP OF RICHMOND, MICHIGAN, a     MAGISTRATE JUDGE STEVEN D. PEPE
Michigan municipal corporation, GORDON
FUERSTENAU, in his official and individual
capacities, THE FOUR TOWNSHIP CITIZENS'
COALITION, INC., a Michigan nonprofit
corporation, JARED SLANEC, KRISTYN SALANEC,
JOHN GIANNONE, SARA GIANNONE, SALVATORE
GIANNONE, NANCY GIANNONE, BILLY TRAVIS,
MARLENE TRAVIS, THOMAS MACKLEY,
PAULA MACKLEY, MICHAEL SYLVESTRY,
MICHAEL LOCK, KARLA SITEK,
ROBERT GRUCZ, LESTER SOVA, DEVON SLANEC,
ANNETTE NORMAN, ANGELA M. JOBS, JOHN REY,
JUDITH REY, LINDA GERHARD, WAYNE WHITMAN,
in his individual capacity, STEVEN MAHONEY, in his
individual capacity, TERESA SEIDEL, in her individual
capacity, MATTHEW FLETCHER, in his individual
capacity, and ANNE HOKANSON, in her individual
capacity, jointly and severally,

       Defendants.
_____

## REPORT AND RECOMMENDATION ON THE STATE DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY FOR SUMMARY JUDGEMENT (DKT. #48)

      This case arises from a disagreement between Plaintiffs, Rondigo LLC and Dolores and

Renee Michaels, and multiple Defendants, including Richmond Township over the use of a farm.

The property at issue is a 71.9 acre parcel of real property located in Richmond Township,

1

Macomb County, Michigan.  The property is zoned for agricultural and residential uses.

Plaintiffs have used this property as a farm and have planted and harvested crops there since

2004.  Plaintiffs' claims seem to center around alleged violations of their constitutional rights

due to a conspiracy among the Defendants.  The execution of this conspiracy supposedly

included baseless complaints about noxious smells coming from the Plaintiffs' farm and actions

taken by governmental actors to deprive them of their rights to their property.

On May 12, 2008, Defendants, Wayne Whitman, Stephen Mahoney, Teresa Seidel,

Matthew Flechter and Anne Hokanson (the "State Defendants") moved pursuant to 12(b)(1) and

12(b)(6) or, alternatively Rule 56(b), to dismiss Plaintiffs' complaint (Dkt. #48).  All pre-trial

matters have been referred in accordance with the authority conferred under 28 U.S.C. § 636(b)

(Dkt. #63).  On October 29, 2008, a hearing was held on the State Defendants' motion at which

time all unresolved issues were addressed.  For the reasons stated on the record and indicated

below, **IT IS RECOMMENDED** that the State Defendants' motion be **GRANTED IN PART** and

**DENIED IN PART.**

I.      **BACKGROUND**

      A)      **The Plaintiffs**

The Plaintiffs are Dolores Michaels, Renee Michaels and Rondigo, LLC.  The Michaels

own and operate Rondigo Farm, approximately 70 acres of which are located in Richmond

Township.  Plaintiffs have engaged in both farming and composting activities on the farm.  The

composting program consists of yard clippings and yard waste which the Plaintiffs take from

outside sources for a fee.  The compost is applied on the farm to the Rondigo fields.

**B)      The Defendants**

There are roughly thirty Defendants in this case, falling into four categories:

1)      Richmond Township Defendants:  Richmond Township is the local municipal

government entity.  Defendant Fuerstenau is the Richmond Township supervisor.

2)      Four Township Citizens' Coalition ("FTCC"): FTCC is an organization representing

individuals who live in the area of Richmond Township; the organization challenges commercial

composting activities.

3)      Homeowner Defendants: The Homeowner Defendants allegedly made false complaints

about odors emanating from Plaintiffs' property.

4)      The State Defendants: There are two state departments involved in this case: the

Michigan Department of Agriculture ("MDA") and the Michigan Department of Environmental

Quality ("MDEQ").  Plaintiffs have sued individual employees of these departments in their

individual capacities.

**C)      The Laws Under Which the State Defendants Claim to have been Acting**

**1)      Michigan Right to Farm Act ("MRTFA")**

MRTFA is a voluntary program designed to provide compliance assistance and nuisance

lawsuit protection.  Under MRTFA, a farm operation that emanates odors or dust shall not be

found to be a public or private nuisance if the farm operation conforms to "generally accepted

agricultural and management practices" ("GAAMPs") established according to policies

determined by the Michigan Department of Agriculture ("MDA").  M.C.L.A. 286.473.  Pursuant

to the MRTFA, the MDA, through its director, shall investigate complaints involving a farm

operation, including complaints about odors.  M.C.L.A. 286.474(1).  Upon investigation of such

3

complaints, the director will inform the farm operation owner if they are not in compliance with the GAAMPs.  M.C.L.A. 286.474(3).

> ## 2)      Michigan Agricultural Environmental Assurance Program ("MAEAP")

The MDA administers MAEAP, which is also a voluntary program.  MAEAP is designed to help farms prevent or minimize agricultural pollution risks by teaching the farm owners or operators how to avoid environmental risks and comply with state and federal environmental regulations, including the MRTFA.[1]  Good standing with regard to MAEAP depends on the specifics of the farm, and changes in farming operations may necessitate additional review to maintain good standing.

> ### D)      Factual Background

In February 2006, Plaintiffs requested that the MDA conduct a site inspection to verify their farm operation under MAEAP.  The Rondigo farm was verified under MAEAP for a fifty-two acre site, but the Plaintiffs were informed that in order to maintain verification, they would need to meet all GAAMPs.  In March, Defendant Whitman informed the Plaintiffs that their current verification did not include composting on the property and that if Plaintiffs wanted to compost on the property they would need to update their MAEAP plan to maintain verification.

In October of 2006, the MDA received odor complaints regarding the Rondigo property. The MDA and MDEQ investigated the site, but could not verify the odor.  Yet, they did discover that the Plaintiffs needed to submit a Nutrient Management Plan Compost Operation Plan

---

[1]  http://www.maeap.org/modules.php?name=NavSystem&id=1&mt=4

("COP").  Plaintiffs sent in the COP on November 21, 2006, but it was incomplete and needed additional information before it could be approved.  The Defendants claim that the MDA never received a complete COP from Rondigo.  Complaints about odors coming from the Rondigo property continued to be filed and the MDA continued to visit the Rondigo farm for follow up inspections.  The follow up inspections revealed potential environmental hazards, including the potential release of pollution into the waters of Michigan, and also that Plaintiffs had stockpiled up to 10,000 cubic yards of leaves on the Rondigo property.  These problems allegedly put the Rondigo farm in violation of GAAMPs.  As a result, Plaintiffs lost their MAEAP verification and on May 17, 2007, the MDA referred the case to the MDEQ due to the high levels of yard waste, the lack of an acceptable COP, and the potential for pollution.

Plaintiffs indicate that the presence of the leaves for composting was the stated cause of the MDA's referral to MDEQ.  They also state that this referral was improper because the MDA only gave the Plaintiffs two days to meet the applicable requirements by moving the composting leaves to another location on the farm.  The Plaintiffs further allege that they were prevented from moving the leaves because the Macomb County Circuit Court had entered an injunction preventing the construction of a driveway over which they could transport the leaves (this state court case is discussed in further detail below).

In June of 2007, the MDEQ visited the Rondigo farm and noticed that the Rondigo Plaintiffs had improperly filled wetlands on their property without a permit in order to build an access road.  Plaintiffs applied for an After-the-Fact permit for the filling of these wetlands, but this application was rejected after the MDEQ found that the wetland boundaries on the

documents submitted by Plaintiffs were inaccurate.[2]  Plaintiffs argue that they were unjustly

singled out for harsh enforcement of the zoning and engineering laws; they allege that Richmond

Township has singled out no other entity for the enforcement of these zoning and engineering

standards.

### E)      Previous State Cases Involving Rondigo

Plaintiffs, in their response to the State Defendants' motion to dismiss, include copies of

two state court cases involving Rondigo.

### 1)      Township of Richmond v. Rondigo

In Macomb County Circuit Court (Case No. 2006-1054-CZ), the Township of Richmond

sued Rondigo to, *inter alia*, obtain a declaration that Rondigo's driveway construction project

was barred by a Township Zoning Ordinance, conflicted with the MRTFA, and did not comply

with GAAMPs.  The central issue was whether Richmond Township had the authority under the

law to halt the construction of the driveway.  The Township had attempted to stop the

construction of the driveway because the construction activities required a site plan review

according to a zoning ordinance.  Rondigo, however, continued to work on the road "under the

cover of darkness" and told the Sheriff's Department that they "would not stop, and that the

Sheriff's Department could not make them stop."

---

[2] Another major issue in this case is a dispute over the construction of a driveway on the Rondigo farm that would cross a public drain.  Although the briefs do not fully explain this construction, it appears that the driveway project was separate from the access road project.  The State Defendants argue that the construction of this type of driveway requires a permit and that the Plaintiffs had begun this litigation before completing the permit-application process.  Yet, the Plaintiffs argue that the Defendants have wrongfully prevented them from completing this driveway because the relevant ordinance does not apply to the extension of a driveway on a farm.

In ruling on both parties' motions for summary judgment (Dkt. #58, Ex. 1), Circuit Judge John Foster determined that Michigan's MRTFA did not preempt the ability of local governments to regulate the construction of driveways on farms. The court reached this conclusion by ruling that Rondigo's driveway was not directly related to an activity protected under the MRTFA.  The court, however, refused to grant summary judgment to the Township because issues of fact remained regarding whether the driveway was in fact subject to regulation under the Zoning Ordinance.

Later, Judge Foster temporarily dissolved a temporary restraining order and preliminary injunction barring Rondigo from building the driveway on its property (Dkt. #58, Exhs. 2 & 3).[3] Judge Foster took this action because he found that the construction of the road was necessary to allow the transportation of the composting leaves, which was required for Rondigo to obtain MDA site plan approval.  Further, he found that ground fill activities that complied with the MRTFA and GAAMPs could be carried out without prior township approval because a township ordinance demanding otherwise would improperly be in direct conflict with state law.  Yet, he found that neither the MRTFA nor the related GAAMPs preempted the Township's ordinance regulating the construction of driveways.  Thus, Judge Foster allowed Rondigo to build the driveway to move the leaves, but stated that the issue of whether the driveway conflicted with the ordinance remained an open question; as a result, Rondigo remained potentially liable for the construction of the driveway.

> ### 2)      Four Township Citizens' Coalition v. Rondigo

---

[3] The restraining order was entered on March 27, 2006, by the Honorable Deborah Servitto, and the preliminary injunction was entered on April 6, 2006, by the Honorable Robert Chrzanowski.

In Macomb County Circuit Court (Case No. 06-1471-CZ), FTCC brought this action claiming that the alleged commercial composting facility on the Rondigo farm was a nuisance and a violation of the Michigan Environmental Policy Act (Dkt. #58, Ex. 4). They also sought a declaratory judgment under the MRTFA. Judge Foster, however, dismissed the complaint, ruling that FTCC did not have standing to sue. Judge Foster reasoned that FTCC's complaint and allegations hinged upon the assertion that Rondigo was a commercial composting operation. Yet, FTCC could not show an injury in fact because it was unable to present evidence that Rondigo was actually a commercial composting operation; without such evidence, the injuries FTCC asserted in its complaint were merely hypothetical or conjectural, which does not satisfy the Supreme Court's test for standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). With no proof of an injury in fact, FTCC had no standing to sue Rondigo for nuisance. The Michigan Court of Appeals upheld Judge Foster's decision, holding that "the trial court properly found that plaintiffs could not simply rely on the unsupported allegations in the complaint [that Rondigo was a commercial composting operation] and that plaintiffs must support the allegations with documentation" (Dkt. #58, Ex. 5, p. 5).

### F)    Plaintiffs' Allegations

Plaintiffs bring this action claiming that Defendants have improperly prevented them from going forward with a composting operation and the construction of a driveway on their property. Plaintiffs generally have made allegations involving conspiracy, lying, unequal treatment under the law, and defamation by the Defendants. For instance, they assert that the State Defendants have conspired to interrupt their use of their farm and, through lying and misinformation, have attempted to hold them to a higher standard than is either legally

8

permissible or enforced against other property owners; neighbors and community groups have conspired against them and submitted baseless complaints regarding foul odors coming from the Rondigo farm; the Defendants in general have made false oral and written statements in order to subject the Plaintiffs to public scorn, ridicule, and embarrassment.

Plaintiffs' Amended Complaint includes the following counts:

1.     Claims Under 42 U.S.C. § 1983: Plaintiffs claim that the Defendants have deprived them of their federal procedural and substantive due process rights and Fourteenth Amendment right to Equal Protection; have taken their property in violation of the Seventh Amendment (although Plaintiffs state that they meant to bring the takings claim under the Fourteenth Amendment); and have denied them their right against retaliation under the First Amendment.

2.     Unconstitutionality of the Richmond Township Ordinance: Plaintiffs claim that the Richmond Township Ordinance dealing with "non-residential driveways" is unconstitutionally vague.

3.     Federal Conspiracy Claims Under 42 U.S.C. § 1985(3): Plaintiffs state that the Defendants worked with a common purpose and in agreement to deprive the Plaintiffs of their First, Seventh, and Fourteenth Amendment rights.

4.     Neglect to Prevent Claims Under 42 U.S.C. § 1986: Plaintiffs bring this claim for the alleged knowing failure of the Defendants to prevent the violation of their rights.

5.     Civil Conspiracy: Plaintiffs allege that the Defendants acted under a preconceived plan to commit unlawful acts, including fraud.

6.     Defamation: Plaintiffs claim that the Defendants knowingly made false statements, in writing and orally, to third parties in order to subject the Plaintiffs to public scorn, ridicule, and

embarrassment.

### G)      The State Defendants' Pending Motion

The State Defendants raise the following issues in their motion:

1.       Whether this Court should dismiss the Plaintiffs' Taking Clause claims against them because the claims are not ripe for review under *Williamson County v. Hamilton Bank*, 473 U.S. 172 (1985).

2.       Whether this Court should dismiss the claims against the State Defendants under the doctrine of qualified immunity.

3.       Whether this Court should dismiss Plaintiffs' state law claim of defamation against them because it fails to overcome Michigan's public immunity statute MCL 691.1407(2)(C) and because Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

4.       Whether Plaintiffs retaliation claims against the State Defendants fails to state a claim upon which relief may be granted.

It should also be noted that on October 9, 2008, the State Defendants moved for an order staying discovery until such time as the Court renders a decision on the State Defendants' entitlement to immunity argued in the present motion to dismiss (Dkt. #68).  The State Defendants also filed an October 13, 2008, motion seeking to quash a subpoena compelling Becky Beauregard's appearance for deposition and the production of documents (Dkt. #69).  On October 29, 2008, a hearing was held on these motions at which time all unresolved issues were addressed.  For the reasons stated on the record and indicated in this Court's November 5, 2008, and December 12, 2008, Orders (Dkt. #80 & #90), the State Defendants' motions were granted, and all discovery requests in this case were stayed pending resolution of the present motion.

10

Plaintiffs' counsel, Cindy Rhodes Victor, has filed an affidavit pursuant to Fed. R. Civ. P. 56(f) in response to the State Defendants present dispositive motion indicating that discovery has just commenced in this case, and that she requires additional discovery to defend her position (Dkt. #58, Ex. 38).

## II.   ANALYSIS

### A)   Fed. R. Civ. P. 12(b)(6)

Fed. R. Civ. P 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted."  "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."

The long accepted rule on what constitutes sufficiency in pleading is drawn from *Conley v. Gibson*, 355 U.S. 41, 46 (1957), which stated "that a complaint should not be dismissed for failure to state a claim unless *it appears beyond doubt* that the plaintiff can *prove no set of facts* in support of his claim which would entitle him to relief." (Emphasis supplied.)  Yet in 2007, the Supreme Court in *Bell Atlantic Corp. v. Twombly,* 550 U.S. ----, 127 S.Ct. 1955, 1965 (2007), modified the standard for dismissal.  While courts are still to use the Rule 12(b)(6) standard for measuring futility of a proposed amended claim, *Twombly* rejected the Rule 12(b)(6) standard articulated in *Conley*.  *Twombly*  notes that under a "literal reading of *Conley*'s 'no set of facts' standard,  a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of

11

[undisclosed] facts' to support recovery." *Twombly* 127 S.Ct. 1955, 1968 (2007). *Twombly* rejects this literal reading of *Conley* and required that pleadings state sufficient facts to show not just a possible, but a "plausible" claim of relief. Instead of the "no set of facts" standard of *Conley, Twombly* endorsed the standard that a complaint be plausible to the extent that from the facts alleged there is a "'reasonably founded hope' that a plaintiff would be able to make a case," citing *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 347 (2005), and its quote from *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741(1975).

*Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009), suggests that *Twombly* should be limited to costly and sprawling litigation. Thus, *Twombly* unquestionably applied to a case such as this one. Consistent with this clarification by *Twombly*, the Sixth Circuit had earlier noted that it is not enough for a complaint to contain mere conclusory allegations of wrongful conduct, rather some factual basis for such claims must be set forth in the pleadings. See *e.g. Chapman v. City of Detroit,* 808 F.2d 459, 465 (6th Cir.1986); "A judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations." *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995). In deciding a motion under that Rule, "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true." *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996). The court is not required to accept as true alleged legal conclusions or unwarranted factual inferences. *Gregory v. Shelby County,* 220 F.3d 433, 446 (6th Cir. 2000); *see also Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir. 1987).

**B)      Fed. R. Civ. P. 12(b)(1)**

Motions to dismiss due to lack of subject matter jurisdiction are governed by Fed. R. Civ.

12

P. 12(b)(1).  When subject matter jurisdiction is challenged, Plaintiff has the burden of proving that the Court properly has jurisdiction.  *See Rogers v. Stratton Industries, Inc*., 798 F.2d 913, 915 (6th Cir. 1986). The Court has the power to resolve factual disputes when subject matter jurisdiction is at issue.  *See Moir v. Greater Cleveland Regional Transit Auth*., 895 F.2d 266, 269 (6th Cir. 1990).

Federal courts are courts of limited jurisdiction and may exercise only those powers authorized by Constitution and statute.  *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).  Therefore, "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (citations omitted).  The first and fundamental question presented by every case brought to a federal court is whether it has jurisdiction to hear a case, even where the parties concede or do not raise or address the issue.  *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).  "Quite aside from whether the parties raise jurisdictional issues themselves – even attempt to consent or agree to federal jurisdiction – federal courts have an independent obligation to investigate and police the boundaries of their own jurisdiction." *Douglas v. E.G. Baldwin Assoc., Inc*., 150 F.3d 604, 606 (6th Cir. 1998).

    **C)**    **Factual Analysis**

        **1)**    **Plaintiffs' "Takings" Claim**

The State Defendants assert that this Court lacks subject matter jurisdiction over the Plaintiffs' Takings Clause Claim against the State Defendants because the claim is not ripe for review based on *Williamson County Regional Planning Commission v Hamilton Bank of Johnson City*, 473 U.S. 172 (1985).  Before seeking review from the federal courts, Defendants

claim that pursuant to the Supreme Court's 1985 decision, Plaintiffs are required to first give the state court an opportunity to adjudicate the issue of just compensation. Therefore, the State Defendants contend the District Court should dismiss the Plaintiffs' Taking Clause Claims pursuant to Fed. R. Civ. P. 12(b)(1).

In *Williamson County Regional Planning Commission*, the Supreme Court held that a particular takings claim was not ripe for adjudication in federal court because the property owner "did not seek compensation through the procedures the State has provided for doing so." *Williamson*, 473 U.S. at 194 (footnote omitted). The Court noted that "[t]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." *Id*. Therefore, the Court concluded: "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Id.* at 195 (footnote omitted). Accordingly, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Coles v. Granville*, 448 F.3d 853, 861 (6th Cir. 2006) (quoting *Williamson*, 473 U.S. at 195). The State of Michigan provides an adequate "just compensation" procedure. *See Macene v. MJW, Inc*, 951 F.2d 700,704 (6th Cir. 1991).

There is no dispute that Plaintiffs' First Amended Complaint alleges that unspecified "Defendants" took action which resulted in a "taking" of their property (Dkt. #4, ¶ 215). Yet, Plaintiffs claim in their Response to the present motion that they seek redress for Defendants' impairment and taking of their property rights under the Fourteenth Amendment and not under

14

the Fifth Amendment as incorporated in the Fourteenth Amendment (Dkt. #58, p. 33).[4]  Indeed, the words, "Fifth Amendment," "regulatory taking" or "inverse condemnation" are not found in Plaintiffs' Amended Complaint.  And there are no allegations in the Amended Complaint that Plaintiffs seek from the State Defendants damages for inverse condemnation.  Rather, Plaintiffs' Amended Complaint alleges several causes of action for violations of 42 U.S.C. § 1983, including violations of their rights to substantive and procedural due process under the Fourteenth Amendment.

In *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1215-1216 (6th Cir. 1992), the Sixth Circuit listed five types of claims based on purported zoning violations, in light of federal law. As explained in more detail in *Eide v. Sarasota County*, 908 F.2d 716, 720-722 (11th Cir. 1990), which the Sixth Circuit cited with approval, those claims are as follows: (1) a just compensation takings claim, in which a zoning regulation applied to property amounts to a taking without compensation, with a remedy of just compensation; (2) a due process takings claim, in which applying a zoning regulation to the property amounts to a taking without due process of law, with a remedy of invalidating the zoning as applied; (3) an arbitrary and capricious substantive due process claim, based on a plaintiff's assertion that (either on its face or as applied) a zoning regulation is arbitrary or capricious because it does not bear a substantial relation to public health, safety, morals, or general welfare; (4) an equal protection claim, employing either strict scrutiny for a protected class or a rational basis test for economic discrimination; and (5) a

---

[4] In paragraph 215 of Plaintiffs' Amended Complaint, they allege a violation of the Seventh Amendment, and not the Fifth or Fourteenth Amendments.  As the Seventh Amendment guarantees a right to a jury trial and does not provide any protection as to property rights, Plaintiffs assert this is a clear scrivener's error (Dkt. #58, p. 33).

15

procedural due process claim, which challenges a lack of notice and/or opportunity to be heard.

While a just compensation takings claim, brought to challenge an alleged Fifth Amendment violation, requires that a plaintiff first exhaust state remedies pursuant to *Williamson County Regional Planning Commission v Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), the Sixth Circuit has held that not all types of claims based on purported zoning violations require exhaustion of state remedies before they can be heard in federal court. *See, e.g., Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1215 (6th Cir. 1992) ("the very existence of an allegedly unlawful zoning action, without more, makes a substantive due process claim ripe for federal adjudication"); *Nasierowski v. Sterling Heights*, 949 F.2d 890, 894 (6th Cir. 1991) ("a procedural due process claim is instantly cognizable in federal court without requiring a final decision on a proposed development from the responsible municipal agency"); *Hammond v. Baldwin*, 866 F..2d 172, 176 (6th Cir. 1989) ("If the injury is the infirmity of the process, neither a final judgment nor exhaustion is required").

Here, Plaintiffs explicitly maintain in their Response to the present motion that they are not bringing a Fifth Amendment claim but rather a claim for violations of their procedural and substantive due process rights under the Fourteenth Amendment. Accordingly, pursuant to the existing case authority in the Sixth Circuit, cited above, the claims in Plaintiffs' Amended Complaint are ripe for adjudication. It is therefore **RECOMMENDED** that the State Defendants' motion to dismiss for lack of subject matter jurisdiction brought pursuant to Fed. R. Civ. P. 12(b)(1) be **DENIED.**

### 2)      Due Process

The Fourteenth Amendment provides that a State may not "deprive any person of life,

liberty or property, without due process of law."  U.S. Const. amend XIV § 2.  Indeed, "the Due

Process Clause provides that certain substantive rights--life, liberty, and property--cannot be

deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v.*

*Loudermill*, 470 U.S. 532, 541 (1985).  *See also Mullane v. Cent. Hanover Bank & Trust Co.*,

339 U.S. 306, 313 (1950) (noting that the Due Process Clause "require[s] that deprivation of life,

liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate

to the nature of the case").

    As a threshold matter, to establish a cognizable claim of a violation of procedural or

substantive due process, Plaintiffs must establish that they possessed a protected liberty or

property interest.  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  "Only after identifying such

a right do[es this Court] continue to consider whether the deprivation of that interest contravened

the notions of due process." *Wojcik v. City of Romulus*, 257 F.3d 600, 609 (6th Cir. 2001).

"Even though individuals often claim property interests under various provisions of the

Constitution, such interests are not created by the Constitution; nor may individuals manufacture

a property interest." *Id.*  Rather, "[r]esolution of the federal issue begins . . . with a

determination of what it is that state law provides." *Town of Castle Rock, Colo. v. Gonzales*, 545

U.S. 748, 757 (2005).[5]  "'To have a property interest in a benefit, a person must clearly have

_____

    [5] "[P]roperty interests are not created by the Constitution itself, but rather by 'existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'"  *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)); *Leis v. Flynt*, 439 U.S. 438, 441 (1979).  To establish a vested interest, Plaintiffs must show that the State Defendants did not have discretion to deny the application Plaintiffs argues created a property or liberty interest.  *Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls*, 263 F.3d 627, 641-642 (6th Cir. 2001) rev'd on other grounds, 538 U.S. 188 (2003); *Silver*, 966 F.2d at 1036; *Triomphe Investors v. City of*

17

more than an abstract need or desire' and 'more than a unilateral expectation to it.'" I*d.* at 756

(quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).

Plaintiffs do not articulate or cite law supporting the existence of any type of

vested interest they were deprived of.  Inasmuch as Plaintiffs have not shown that they enjoyed a

protected interest in having the protections of the MRTFA or in being allowed to run a

composting operation and getting their COP approved, this Court need not determine whether

they were afforded due process.  Even assuming Plaintiffs had a vested interest, however, they

cannot succeed on arguments that the state did not provide them with sufficient process.  There

is ample evidence in the record to support a finding that the State Defendants afforded Plaintiffs

with sufficient notice and took actions that satisfied Plaintiffs' due process rights.

### Procedural Due Process

To establish a procedural due process claim pursuant to § 1983, Plaintiffs  must establish

three elements: (1) that they have a life, liberty, or property interest protected by the Due Process

Clause; (2) that they were deprived of this protected interest within the meaning of the Due

Process Clause; and (3) that the state did not afford them adequate procedural rights prior to

depriving them of their protected interest.  *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999).

Moreover, the Supreme Court ruled in *Parratt v. Taylor*, 451 U.S. 527, 543-44 (1981),

---

*Northwood*, 49 F.3d 198, 201-204 (6th Cir. 1995); *Glenn v. Clement Twp.*, No. 05-10093, 2006
U.S. Dist. LEXIS 51461, at *38 (E.D. Mich. July 27, 2006); *Hillside Prods. v. Duchane*, 249 F.
Supp. 2d 880, 893 (E.D. Mich. 2003).  In other words, if the State Defendants had discretion to
deny Plaintiffs' application or request, even if Plaintiffs complied with the minimum mandatory
requirements, Plaintiffs would have neither a "legitimate claim of entitlement" nor a "justifiable
expectation" in the approval of their request.  *See Triomphe*, 49 F.3d at 201-204; *J.D. P'ship v.
Berlin Twp. Bd. of Trs.*, 412 F. Supp. 2d 772, 780 (S.D. Ohio 2005); *see also Tri-Corp Mgmt.
Co. v. Praznik*, No. 00-4326, 33 Fed. Appx. 742, 748 (6th Cir. Mar. 29, 2002) (unpublished).

that negligent deprivation of property does not rise to the level of a violation of the Fourteenth

Amendment's due process clause where the state provides an adequate post-deprivation remedy.

This ruling has been extended by the Supreme Court to intentional deprivations, and to

deprivations of liberty as well as property. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984)

(extending *Parrat* to intentional deprivations of property); *Zinermon v. Burch*, 494 U.S. 113, 132

(1990) (extending *Parrat* and *Hudson* to deprivations of liberty). Thus, under this line of cases,

where there are adequate state procedures, even intentional deprivations of liberty are not

actionable if the state provides adequate post-deprivation remedies. These cases are applicable,

however, only in the "special case" where the state actor's conduct is random and unauthorized;

in such instances, "postdeprivation tort remedies are all the process that is due, simply because

they are the only remedies that the State could be expected to provide." *Zinermon*, 494 U.S. at

128. The general rule is that the "Constitution requires some kind of hearing before the State

deprives a person of liberty or property." *Id*. at 127.

In determining whether or not a predeprivation hearing is constitutionally required, the

court must determine whether effective predeprivation procedures are possible and could have

reasonably been used. As the Supreme Court noted in *Hudson v. Palmer*, 468 U.S. 517, 534

(1984), "[t]he controlling inquiry is solely whether the State is in a position to provide for

predeprivation process." When the deprivation of a liberty interest is affected by State actors

who are acting pursuant to established procedures which failed to provide for predeprivation

process in a situation where such process was possible, and practical, then such predeprivation

processes are constitutionally required. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422,

435-37 (1982). *See also Watts v. Burkhart*, 854 F.2d 839, 843 (6th Cir. 1988). In *Zinermon*, the

19

Supreme Court, in a five-to-four opinion, determined that the *Parratt/Hudson* rule did not apply where: (1) The erroneous deprivation was not unpredictable; (2) predeprivation process was practicable; and (3) the challenged conduct was "authorized" in a sense that the state delegated to the defendant the power and authority to effect the very deprivation complained o,  but the state did so without adequate procedural safeguards, thus there was an abuse by state officials by of "uncircumscribed power." *Zinermon*, 494 U.S. at 136-39.

Before addressing Plaintiffs' claims, it should be noted that Plaintiffs' arguments and statements in their Amended Complaint regarding alleged substantive and procedural due process violations are often imprecisely articulated.  Such imprecision weakens the argument, and also

requires this Court to construct – and at times guess –  what Plaintiffs are saying.  Nevertheless, the allegations in Plaintiffs' Amended Complaint have been carefully reviewed for any statements or allegations that might constitute a claim of a due process violation.  Yet, as discussed below, the Court does not find that Plaintiffs procedural due process rights were violated.

In February of 2006, Plaintiffs requested that MDA conduct a site inspection to verify their purported farming operation through the MAEAP Cropping System (Dkt. #1, Ex. 1).[6]  The MDA visited the site and then, on February 17, 2006, sent Plaintiffs a letter indicating that they were verified in the MAEAP Cropping System, which required a nutrient management plan (known as the "MAEAP Cropping System Improvement Plan") for the Rondigo site (*id.*).

---

[6] Although Plaintiffs filed an Amended Complaint (Dkt. #4), they did not re-attach their exhibits from their Original Complaint (Dkt. #1) to their new filing.  Accordingly, all references to exhibits submitted in support of Plaintiffs' Amended Complaint refer back to docket entry #1.

In order to maintain MAEAP verification, the MDA informed Plaintiffs that they were required to comply with the GAAMPs (*id.*).  At this time, Plaintiffs were informed they must strictly follow a specific plan regarding future use of compost as a soil amendment and not to exceed the cropping nutrient needs at the site (*id.*).  At this time, the MDA informed Plaintiffs that verification in good standing was contingent on full compliance with GAAMPs and was based upon any changes to conditions on the property (*id.*).  Defendants indicate that at no time during the MAEAP certification process did Plaintiffs indicate to MDA any intention to conduct on site composting of leaf material from outside sources.  The Plaintiffs' cropping system improvement action plan covered only 52 acres of property (*id.*).  If the Plaintiffs wanted to compost on property larger than the 52 acres, they needed an update to the plan (*id.*).

In March of 2006, Gordon Fuerstenau, the Richmond Township supervisor, inquired about Plaintiffs MAEAP Cropping System Improvement Plan and its relationship to the collection of yard waste or composting (Dkt. #1, Ex. 4).  In his letter in response, Whitman indicated that Plaintiffs' MAEAP Cropping System Improvement Plan did not include any information relating to yard waste or composting on the property and if Plaintiffs wanted to do so, the plan would need to be updated and then approved (*id.*).

Beginning in October of 2006, the MDA received complaints from local citizens about a foul odor that emanated from Plaintiffs' property (Dkt. #48, Ex. 3).  One complaint alleged that Plaintiffs had permitted Waste Management trucks to dump materials that caused excessive and unusual odors that could be detected up to one mile away (*id.*).  In fact, as early as October 2006, several complaints were sent to the MDA regarding odors on Plaintiffs property (Dkt. #48, Ex.

21

4).  Whitman, who fielded these complaints on behalf of the MDA, requested that MDA and

MDEQ conduct a joint "multi-media" inspection of the property because the serious nature of

the complaints raised environmental concerns.[7]

As a result of the accumulation of odor complaints, the MDA informed Plaintiffs that

employees of MDA and MDEQ were going to conduct a multi-media inspection of their

property (Letter to Plaintiffs 10/16/06, Dkt. #48, Ex. 5).  The inspection did not verify an odor

complaint, however, Plaintiffs had not provided the MDA with their Nutrient Management Plan

Compost Operations Plan ("COP") (Dkt. #1, Ex. 11).  The MDA notified Plaintiffs of the COP

requirement and that failure to address the COP issue or failure to cooperate with MDA may

result in a referral to MDEQ (*id*.).

Plaintiffs sent their first draft of a COP to the MDA on November 21, 2006. (Plaintiffs'

Nutrient Management Plan received 11/21/06, Dkt. #48, Ex. 6).  At this time, it became apparent

to the MDA that Plaintiffs intended to use their "farm" for large-scale composting.  Yet, this

COP was incomplete and required additional information before it could be approved.  For

example, Plaintiffs' COP indicated site preparation intentions and management options that were

not specific enough to accept with regard to how Plaintiffs plan to manage the facility.  In

addition, the soil and water table information documented in the COP revealed that the site being

used for stockpiling leaves that had begun to decompose was not suitable for composting without

significant site preparation and improvement, risking contamination of ground and surface water.

---

[7] When a particular site may pose a risk to the environment under statutes regulating air
pollution, land contamination, surface or groundwater pollution, and solid waste, multiple
programs within the MDEQ become involved.  A joint inspection by more than one part of the
MDEQ is referred to as a "multi-media inspection."

Plaintiffs had not provided the MDA with records of materials received, or inventory of materials on site to consider in this determination.  The COP did not document that the site used to stockpile yard waste and the site where the composting will take place are suitable to protect the environment.  The COP did not indicate how management of the composting material would be done in conformance to all applicable GAAMPs, and that the Plaintiffs' "farm operation" had sufficient crop land to utilize all of the finished composted material projected to be processed at agronomic rates.  As a result, Plaintiffs' Nutrient Management Plan, which attempted to serve as their COP, was deemed incomplete by the MDA and therefore not acceptable under the GAAMPs.

Subsequent addendums and other documentation were received in December 2006, January 2007, and March 2007; however, the MDA maintains that a complete and acceptable COP was never received.

The MDA continued to receive citizen complaints about Plaintiffs' property in November of 2006 (Dkt. #48, Ex. 4).  On November 9, 2006, Whitman sent an e-mail to MDEQ regarding the ongoing issue and the open odor complaint at Rondigo (Dkt. #1, Ex. 16).  In this e-mail, Whitman noted that since Plaintiffs had failed to comply with all the requirements necessary for an approved COP, the MDA had an open odor complaint (*id.*).

During a follow-up inspection of Plaintiffs' property, the MDA on November 17, 2006, the MDA detected the presence of odors, but they were not considered to be excessive (Special Report 11/17/06, Dkt. #48, Ex. 8).  Stephen Mahoney conducted this inspection for the MDA and noted that the site did not conform to GAAMPs due to a large amount of leaf material compost that was submerged in water.  Again, Plaintiffs were informed of the requirements to

submit a COP to the MDA for review and approval, to document their composting intentions and

to keep and submit records to MDA for review and approval (*id.*).  At the time of this inspection,

Plaintiffs had not submitted to MDA a proper COP,nor did they send any pertinent records for

review and approval.

This inspection also revealed additional yard waste material had been added to the

existing stockpiles at the site (*id.*).  It was noted that the stockpiled yard waste sat adjacent to

standing water, which is conducive to the formation of anaerobic decomposition conditions and

can lead to nuisance odors.  In addition, the MDA reported that the ponded water and yard waste

leachate posed a potential for a discharge of polluted water to the nearby drain, and ultimately to

the State of Michigan waters.  Based on the new conditions observed during the inspection,

MDA noticed potential environmental hazards and requested the MDEQ conduct an additional

inspection on the property.

MDA continued to work with Plaintiffs by providing them information on how to comply

with GAAMPs for nutrient utilization and informed Plaintiffs again that they were to forward a

COP (Letter to Plaintiffs 12/5/06, Dkt. #48, Ex. 9).  On December 18, 2006, Mr.oney informed

Plaintiffs that a follow up inspection will be conducted on January 10, 2007 (Letter to Plaintiffs

12/18/06, Dkt. #48, Ex. 10).

Based on additional complaints of foul odors from large amounts of yard clippings on the

property, MDA's Mahoney, accompanied by MDA's Michelle Crook, conducted an inspection

of

the yard waste composting and nutrient management practices at the site on January 10, 2007

(Dkt. #1, Ex. 21).  This inspection revealed evidence that Plaintiffs had stockpiled up to 10,000

24

cubic yards of leaves on the property which was in violation of GAAMPs. This inspection also

showed that the leaves were not placed on an acceptable site and that the pile of material had

been transferred into windrows (a type of mound of the composting materials). The windrows

were submerged in water, which did not comply with the handbook adopted by the GAAMPs.

*See* MCL 286.473 *et al.* Conditions were observed on the property which revealed the presence

of serious environmental risks and hazards. (Special Report 1/10/07, Dkt. #48, Ex. 11).

Following Mahoney's follow-up inspection, Plaintiffs sent MDA an updated site plan on

January 29, 2007, and an updated nutrient management plan on January 31, 2007 (Dkt. #1, Ex.

21). There were significant problems, however, with Plaintiffs updated plans. The State

Defendants maintain that the Plaintiffs proposed plans had the following problems:

> • There were missing documents and discrepancies between the site plan and the COP regarding the amount of composting on site (In a letter dated February 5, 2007, Mahoney indicated the problems with the plans and precisely what Plaintiffs need to do to rectify the problems).
>
> • There was missing documents and discrepancies between the site plan and the COP regarding the amount of composting and volume of leaves on site.
>
> • The seasonal high water table at the site made the location of the composting operation a poor location for composting and insufficient land area on the site as a whole to distribute the composted materials without overloading the nutrient levels in the soil (In a letter dated February 5, 2007, Mahoney detailed the problems with the plans and precisely what Plaintiffs needed to do to rectify the problems, which included recommendations to find an appropriate staging site and find other locations to receive the composted materials).

Plaintiffs provided sub-surface soils and water table information that documented the site

was currently used for stockpiling leaves but the area was not suitable without significant site

preparation (*id.*). Therefore, MDA recommended the yard waste be removed from the unsuitable

site until the site was prepared to adequately protect groundwater resources from potential

25

nutrient leaching (*id.*).

After Plaintiffs failed to comply with GAAMPs, MDA sent a letter to Plaintiffs indicating

they formally lost MAEAP verification of their cropping system on April 13, 2007 (Dkt. #1, Ex. 28). This letter dealt with GAMMPs, not with Plaintiffs' failure to move the leaves.

On May 17, 2007, the MDA formally referred Plaintiffs to the MDEQ based on the yard waste levels on their property, the lack of an acceptable COP, and the potential for pollution (Dkt. #1, Ex. 33; Letter to Plaintiffs 5/17/06, Dkt. #48, Ex. 12). The State Defendants maintain that due to the serious environmental concerns caused, in part, by the inadequacy of the site for composting purposes, the referral to MDEQ was necessary (*id.*).

On June 18, 2007, the MDEQ conducted a multimedia inspection performed on Plaintiffs' property to determine whether any violations of the Natural Resources and Environmental Protection Act, 1994 Public Act 451 was occurring on the property (Letter to Plaintiffs 7/18/07, Dkt, #48, Ex. 13). The inspection conducted by MDEQ-LWMD identified environmental violations, including a violation of Part 301 and Part 303, which indicates that a new culvert was installed in a stream, an existing culvert was replaced in a stream, and that fill was placed in wetland without a permit (*id.*). MDEQ's Water Bureau identified that a potential future groundwater violation that may occur if the leaf piles were left in the location they were at the time of the inspection.

The Notice of Violation ("NOV") dated July 18, 2007, identified that Plaintiffs improperly installed a culvert within a stream and placement of fill within wetland without a permit, in order to construct an access road (Notice of Violation, Dkt. #48, Ex. 14). The NOV

26

requested a response from Plaintiffs, but did not require restoration of the site or submittal of an

After-the-Fact ("ATF") application, at this time.  The NOV also indicated that Plaintiffs may

seek an ATF permit after review of the requested information.  MDEQ's LWMD also

determined

that the road fill at Plaintiffs' site did not meet the exemption criteria, and was therefore, a

violation of Part 303, in addition to the previously identified violation of Part 301.  Overall,

MDEQ found violations of Part 301, Inland Lakes and Streams, and of Part 303, Wetlands

Protection.

Plaintiffs submitted an ATF permit application on August 10, 2007, which sought permit

approval for fill in wetland, and installation of a culvert within a stream, under the authority of

both Part 301, Inland Lakes and Streams, and Part 303, Wetlands Protection, of the Natural

Resources and Environmental Protection Act, 1994 PA 451 for the purpose of constructing a

road (Dkt. #48, Ex. 15).  The ATF permit application indicated that Plaintiff authorized

"representatives of the MDEQ, USACE, and/or their agents or contractors to enter upon said

property in order to inspect the proposed activity site and the completed project."  Part of the site

inspection review of permit applications under Part 303 requires the MDEQ staff review and

approve or refute the applicants' identified wetland line.

On September 27, 2007, MDEQ- LWMD's Anne Hokanson and Melanie Foose

conducted the an ATF permit application site inspection (Inspection Report 9/27/07, Dkt. #48,

Ex. 16). Hokanson and Foose reviewed the wetland boundaries as indicated on the plans

submitted by Plaintiffs and found that the wetland was under-identified and the wetland

boundary was inaccurate.  Hokanson made a drawing and notes indicating the specific areas of

concern.  As a result of the inaccurate wetland boundary, the wetland impacts were not properly identified in the permit application, and that the application could not be approved in its current state.

Due to application processing rules and deadlines, Plaintiffs had to choose between the following options: (1) to withdraw the application and re-apply with the appropriate wetland identification, permit fee, and mitigation plan, or, (2) do nothing and DEQ would deny the application.  The applicant needed to accurately identify the wetland and provide a greater application fee, and then the DEQ would have to public notice the application, and the processing deadlines would not have allowed for this to happen before DEQ had to make a decision.  Therefore, unless the applicants withdrew their application and reapplied with the appropriate fee and wetland line, the DEQ would have no choice but to deny the current application.

On October 10, 2007, MDEQ's AQD received calls from adjacent landowners with complaints of strong, putrid odors emanating from Plaintiffs' property during the afternoon of October 9, 2007 (DEQ AQD Activity Report 10/12/07, Dkt, #48, Ex. 17).  These complaints did not result in any additional violations.

Eventually, Plaintiffs wanted to construct a road on their property which required a permit from the MDEQ.  Before Plaintiffs completed the permit application process, they filed the present action.

In paragraph 99 of Plaintiffs' Amended Complaint, they claim that on August 25, 2006, Defendant Seidel "ordered a joint inspection of the Rondigo site, without any evidence to support such an inspection, and without any referral of the farm to the MDEQ by the MDA, as

set forth by Defendant Whitman in his April 25, 2006 letter."  Similarly, in paragraph 144,

Plaintiffs state:

> Defendant Seidel had ordered yet an unwarranted inspection of the Rondigo site on or before December 21, 2006, which Tracy Kaskemeti of the MDEQ, Water Bureau, questioned, stating "I'm not [sure] we need to go. Last time we were out there, we didn't identify any problems. . . ." In order to convince others in the MDEQ to go out on the inspection, defendant Seidel falsely reported that there had been "many complaints" since October 18, 2006, the date of the last inspection (a copy of this email correspondence exchange is attached hereto as Exhibit 23).

(Dkt. #4, ¶ 144).  Plaintiffs also state in paragraph 179 that on May 31, 2007, Plaintiffs were

advised that "defendant Seidel had ordered her staff to conduct an inspection at the Rondigo site

on June 18, 2007, even though she knew that there were no environmental issues or legitimate

complaints regarding that site, and that there had been no activity on that site other than the

farming which had existed for years."  (Dkt. #4, ¶ 179).

Nowhere in Plaintiffs' Amended Complaint or Response to the present motion do

Plaintiffs illustrate how Seidel took any action that violated a constitutional right belonging to

Plaintiffs.  Plaintiffs do not have a constitutional right to be free from inspections of their

property, particularly when these inspections are required by statute.  *See* MCL 286.474 *et seq.*

Plaintiffs attempt to confuse the subsequent verification of the odor complaints with the issue

that the odor complaints should have never been investigated in the first place (Dkt. #58, p. 7).

The MDA and MDEQ's receipt of odor complaints pertaining to Plaintiffs' property is separate

and distinct from the subsequent verification of those odor complaints.  The fact that the odor

complaints may not have been later verified  does not mean that any inspections are unlawful.

Nor can Plaintiffs simply conclude that each of the State Defendants documents reflecting

MDEQ violations following inspections are untrue or inaccurate resulting in a violation of their

constitutional rights.

Moreover, there is ample evidence in the record to support Siedel's decisions to order investigations. The Rondigo Farm Complaint Call Log, attached to the State Defendants' Motion documents the numerous complaints the MDA received between October 2006 and January 2007 regarding Plaintiffs' property (Dkt. #48, Ex. 4). Inspector Joe Kelpinski's November 8, 2006, letter states that in "reference to the RTF complaint filed by Mr. Jared Slanec concerning excessive offensive odor that smelled like dead animal carcasses at Rondigo Farms in Richmond Township, I initiated an investigation into this complaint" (Dkt. #1, Ex. 12). Similarly, Inspector Steven Mahoney's Special Report (Dkt. #48, Ex. 8) indicates that on October 18, 2006, MDA-ESA conducted a right to farm investigation at the Rondigo Farms Composting Site in response to an odor complaint. In addition, between November 1 and November 15, 2006, MDA received calls from neighboring residences complaining of odors they associated with Rondigo Farms. "As a result of these complaints and the review of Rondigo's COP, MDA scheduled a follow-up inspection at the farm for Friday, November 17, 2006, 11:00 a.m" (*id.*).

Based on additional complaints of foul odors from large amounts of yard clippings on the property, MDA's Mahoney, accompanied by MDA's Michelle Crook, conducted an inspection of the yard waste composting and nutrient management practices at the site on January 10, 2007 (Dkt. #1, Ex. 21). This inspection revealed evidence that Plaintiffs had stockpiled up to 10,000 cubic yards of leaves on the property; which was in violation of GAAMPs. This inspection also showed that the leaves were not placed on an acceptable site and that the pile of material had

30

been transferred into windrows.  The windrows were submerged in water, which did not comply with the handbook adopted by the GAAMPs.

On May 17, 2007, the MDA formally referred Plaintiffs to the MDEQ based on the yard waste levels on their property, the lack of an acceptable COP, and the potential for pollution (Dkt. #1, Ex. 33; Letter to Plaintiffs 5/17/06, Dkt. #48, Ex. 12).  Following this referral, the MDEQ conducted a  June 18, 2007,  multimedia inspection on Plaintiffs' property to determine whether any violations of the Natural Resources and Environmental Protection Act, 1994 Public Act 451 was occurring on the property (Letter to Plaintiffs 7/18/07, Dkt. #48, Ex. 13).

Here, the actions taken by Seidel and the others in investigating the odor complaints were objectively reasonable.  In conclusory form, Plaintiffs allege that the only reason why Seidel ordered inspections of Plaintiffs' property and Defendants Mahoney, Whitman, Hokanson and Flechter participated in said inspections was in furtherance of a conspiracy.  Yet, as discussed in detail above, there is nothing to suggest that these Defendants' actions were not taken in good faith and pursuant to applicable statutes.

In paragraph 150 of their Amended Complaint, Plaintiffs state:

Defendant Mahoney advised the Rondigo plaintiffs that they had until Thursday, April 19, 2007 -- just two days after the letter was postmarked in Lansing, Ingham County, to an address in Harrison Township, Macomb County -- to move the leaves completely, and should the Rondigo plaintiffs not be able move the leaves completely by that date (two days after the letter was even postmarked and an impossibility both in time and because of the Circuit Court injunction), he would have the MDA will begin the referral process to transfer the file to the MDEQ for investigation under the standard pollution investigation process (Exhibit 26).

(Dkt. #4, ¶ 150).

Plaintiffs state further in paragraph 152 that:

Defendants Mahoney and Whitman then caused Janice Welford, Program Manager

31

of MAEAP, by letter nominally dated April 13, 2007, to advise the Rondigo plaintiffs that if the leaves were not moved by April 19, 2007, plaintiff Rondigo's MAEAP certification for its Cropping System, which did not involve the leaves, would be withdrawn (a copy of this letter is attached hereto as Exhibit 28).

(Dkt. #4, ¶ 152).

Here, Plaintiffs appear to be arguing that there due process rights were violated because they were given insufficient notice that they were required to move the leaves off their property or face referral to the MDEQ for investigation under the standard pollution investigation process and/or lose their MAEAP certification.  The record, however, shows that Plaintiffs were clearly made aware of the need to move the leaves on their property on numerous occasions several months before receiving Defendant Mahoney's letter, and that there is no possible way they can maintain that they were surprised by the MDA's request.  As early as the November 17, 2006, inspection, Defendant Mahoney told Plaintiff Delores Michaels and Plaintiffs' Manager, Howard Thorton, that Plaintiffs' composting pile was not in an appropriate location because of standing water and that the pile should be moved to the northwest corner of the property (Dkt. #48, Ex. 8, p. 5).  Moreover, Defendant Mahoney discussed with Plaintiff Delores Michaels and her representatives "the deficiencies of the Compost Operations Plan where additional land is needed, a site plan has not been submitted, and there are many errors in the plan" (Dkt. #48, Ex. 8, p. 3).

In Defendant Mahoney's December 5, 2006, letter to Delores Michaels and her husband, Mr. Mahoney again indicated that Plaintiffs needed to "identify an appropriate site for leaf material staging and composting and move all of the material collected to that location" (Dkt. #48, Ex. 9).  He informed Plaintiffs that the "current site for stockpiling leaves is not consistent with the On-Farm Composting Practices for Nutrient Utilization (Nutrient GAAMPs)" (*id.*).  Mr.

32

Mahoney concluded his letter by warning the Plaintiffs that "should [they] choose not to addresses this issue in cooperation with the MDA, the complaint may be investigated by the Michigan Department of Environmental Quality (MDEQ) under its standard pollution investigation process" (*id.* at 2).

In Mr. Mahoney's February 5, 2007, letter to Plaintiffs he states that his January 10, 2007, inspection revealed evidence that Plaintiffs had stockpiled up to 10,000 cubic yards of leaves on the property (Dkt. #1, Ex. 21). This inspection also showed that the leaves were not placed on an acceptable site and that the pile of material had been transferred into windrows, which were submerged in water. The MDA repeated its determination that the current site being used for stockpiling leaves did not comply with the handbook adopted by the GAAMPs. *See* MCL 286.473 *et al.* Mr. Mahoney again instructed Plaintiffs to "identify an appropriate site for leaf material staging and composting and move all of the material collected to that location" (*id.*). He asked Plaintiffs to provide the MDA with a copy of the above referenced documentation and to notify MDA when the stockpiles of leaf material are moved to an appropriate location (*id.* at 2). Finally, he once again reminded Plaintiffs "should [they] choose not to addresses this issue in cooperation with the MDA, the complaint may be investigated by the Michigan Department of Environmental Quality (MDEQ) under its standard pollution investigation process" (*id.* at 2).

Having received notice on several occasions, starting as early as November 2006, that Plaintiffs needed to move the stockpile of leaves on their property to an appropriate location or face possible referral to the MDEQ, it defies belief that they were surprised to discover in April 2007 that they were required to move the leaf materials on their property or face investigation by

MDEQ.  Moreover, although the MDA originally requested in their correspondence dated April 12, 2007, that all yard waste be removed from the Plaintiffs property by April 19, 2007, MDA agreed to extend this deadline to May 19, 2007, based on Plaintiffs' request (Dkt. #1, Ex. 33). On May 17, 2007, the MDA formally referred Plaintiffs to the MDEQ based on the yard waste levels on their property, the lack of an acceptable COP, and the potential for pollution (Dkt. #1, Ex. 33; Letter to Plaintiffs 5/17/06, Dkt. #48, Ex. 12).

Accordingly, Plaintiffs were clearly provided sufficient notice to comply with the MDA's instructions to remove the stockpile of leaf materials from their property, and Plaintiffs' due process rights were therefore not violated.

In paragraph 172 of Plaintiff's Amended Complaint, they state that "the MAEAP had absolutely no evidence before it that the Rondigo plaintiffs were not in compliance with the GAAMPs for its cropping system" (Dkt. #4, ¶ 172).  Plaintiffs state further in paragraph 173 that "there was no inspection of plaintiff Rondigo's cropping system after February 8, 2006 which would have given rise to the June 8, 2007 letter" (Dkt. #4, ¶ 173).  In addition, Plaintiffs state in paragraph 175 that the "Rondigo plaintiffs were provided with absolutely no notice of the charges against them which would cause the MDA to refer the Rondigo plaintiffs to the MDEQ for any enforcement action because of MAEAP" (Dkt. #4, ¶ 175).

The MDA sent an April 13, 2007, letter to Plaintiffs indicating they lost MAEAP verification due to their failure to follow the applicable GAAMPs.  As described in great detail above, Plaintiffs were repeatedly told they were not in compliance with GAAMPs due to concerns regarding the large stockpile of leaves on their property, the lack of an acceptable COP, and the potential for pollution (Dkt. #1, Ex. 33; Letter to Plaintiffs 5/17/06, Dkt. #48, Ex. 12).

34

Plaintiffs statements they "absolutely no notice of the charges against them" flies in the face of all the evidence in the record, and therefore is not acceptable without more for allowing a case to proceed.

In conclusion, there is ample evidence to support a finding that Plaintiffs' procedural due process rights were not violated.  Here, Plaintiffs received adequate notice about the environmental concerns on their property, the problem with the compost being on an unsuitable site with standing ground water,  and Plaintiffs  were given sufficient time to rectify the problems.  Because they failed to do so, Plaintiffs ultimately lost their MAEAP verification and were referred to the MDEQ.  There is nothing in the record to demonstrate that the State Defendants denied Plaintiffs procedural due process in taking these actions.

Finally, as noted above, under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy.  If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Parratt*, 451 U.S. at 537. This rule applies to both negligent and intentional deprivations of property, as long as the deprivation was not done pursuant to an established state procedure.  If Plaintiffs' claims are premised upon allegedly unauthorized and arbitrary acts of negligent or intentional wrongdoing of unspecified state officials then a pre-deprivation hearing is not feasible, and Plaintiffs must plead and prove the inadequacy of state post-deprivation remedies.  Here, Plaintiffs have not shown that the state does not provide adequate post-deprivation remedies by way of a state circuit court action.

## **Substantive Due Process**

Substantive due process protects citizens from certain intentional misconduct of a state

actor notwithstanding the notice and hearing procedures available before or after the challenged

action.  As noted by Justice Stevens in his separate opinion in *Hudson v. Palmer*, 468 U.S. 517,

541 n. 4 (1984), certain acts by state actors "may not take place no matter what procedural

protections accompany them." The question is whether the State Defendants' conduct is such

that it could "shock the conscience,"[8] of a reasonable fact-finder, constitute "an egregious abuse

of governmental power,"[9] or be said to be incompatible with "the rudimentary demands of

justice"[10] or with "any concept of ordered liberty."[11]

> To state a substantive due process claim a plaintiff must establish that:
>
> (1) a constitutionally protected property or liberty interest exists, and
> (2) that interest has been deprived through arbitrary and capricious action.

*J-II Enters., L.L.C. v. Bd. of Comm'rs*, No. 04-3516, 135 Fed. Appx. 804, 807-808 (6th

Cir. May, 18, 2005) (unpublished); *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966

F.2d 1031, 1036 (6th Cir. 1992).

> Again, Plaintiffs do not articulate or cite law supporting the existence of any type of

vested interest they were deprived of.  This by itself is fatal of Plaintiffs' substantive due process

claims.  Yet, even assuming Plaintiffs had a vested interest, they must also prove that "the

governmental actor either intentionally injured the plaintiff or acted arbitrarily in the

constitutional sense" as to this interest.  *Upsher v. Grosse Pointe Pub. Sch. Sys.*, 285 F.3d 448,

453 (6th Cir. 2002); *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *Buckeye Cmty.*

---

[8] *Rochin v. People of California*, 342 U.S. 165, 172 (1952)

[9]  *Vinson v. Campbell County Fiscal Ct.*, 820 F.2d 194, 201 (6th Cir. 1987).

[10] *Mooney v. Holohan*, 294 U.S. 103, 112 (1935).

[11] *Napue v. People of Illinois*, 360 U.S. 264, 269 (1959).

36

*Hope Found. v. City of Cuyahoga Falls*, 263 F.3d 627, 641-642 (6th Cir. 2001) rev'd on other grounds, 538 U.S. 188 (2003); *see also Richardson v. Twp. of Brady,* 218 F.3d 508, 512-513 (6th Cir. 2000).

Here, a reasonable jury could not find the State Defendants' requests for additional information and for Plaintiffs to take certain steps to rectify repeatedly stated environmental concerns on their property were arbitrary, capricious, or an intentional attempt to injure the Plaintiffs. The State Defendants adequately explained the reasons for the requests and those reasons were based on general notions of health, safety, and community welfare. Accordingly, Plaintiffs have failed to show a substantive due process violation, except perhaps, as discussed below, in the equal protection context.

### 3)      Equal Protection

The State Defendants argue that Plaintiffs claims against them are barred by qualified immunity. Government officials who perform discretionary functions are generally entitled to qualified immunity from individual liability for civil damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Christophel v. Kukulinsky*, 61 F.3d 479, 484 (6th Cir. 1995); *Thomas v. Whalen*, 51 F.3d 1285, 1289 (6th Cir. 1995), *cert. denied*, 516 U.S. 989 (1995); *Pray v. Sandusky*, 49 F.3d 1154, 1157-58 (6th Cir. 1995). Qualified immunity is an affirmative defense and the plaintiff need not anticipate it in the complaint. *Gomez v. Toledo*, 446 U.S. 635 (1980). The Sixth Circuit has held that if a defendant raises a qualified immunity defense, the plaintiff bears the burden of showing that the constitutional right alleged to have been violated was clearly established at the time of the

alleged violation. *Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1174 (6th Cir. 1988); *Dominique v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987). "[I]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals, or itself." *Seiter*, 858 F.2d at 1177.

Qualified immunity seeks to ensure that defendants "reasonably can anticipate when their conduct may give rise to liability," *Davis v. Scherer*, 468 U.S. 183, 195 (1984), by imposing liability only if "[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635 640 (1987). "[I]n effect the qualified immunity test is simply the adaption of the fair warning standard to give officials (and, ultimately, governments) the same protections from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes." *United States v. Lanier*, 520 U.S. 259 (1997). Splits of authority among the circuits is "a circumstance [that] may be taken into account in deciding whether the warning is fair enough" but it is not a categorical bar to a finding of liability. *Id.* To be "clearly established" there need not be prior relevant case law "on all fours" or deciding "the very action in question." *Anderson*, 483 U.S. at 640.[12] *See also McBride v. Village of Michiana*, 100 F.3d 457, 461 (6th Cir. 1996). *McCloud v. Testa*, 97 F.3d 1536, 1557 (6th Cir. 1996), noted that if

---

[12] As noted in *United States v. Lanier*, 520 U.S. 259 (1997), there is no single level of specificity sufficient in every instance. In some circumstance, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary. "But general statements of law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful,' *Anderson, supra*, at 640, 107 S.Ct., at 3039." *Id.* at 271.

courts required prior precedent on the specific facts at issue in the pending case, "qualified immunity would be converted into a nearly absolute barrier to recovering damages against an individual government actor. . . ."

The Supreme Court in *Siegert v. Gilley*, 500 U.S. 226 (1991), set out the "analytical structure under which a claim of qualified immunity should be addressed." The Court is to determine whether the plaintiff has alleged the violation of a clearly established constitutional right. This is a purely legal question. It involves two steps. The first step is to determine whether the alleged conduct violates any constitutionally protected right at all. The second step is to determine whether that constitutional right was clearly established at the time of the defendant's action or failure to act. If the answer to the first question is in the negative, the Court need not consider the second question because if no constitutional right exists, no such right would have been clearly established.

The question whether an official is protected by qualified immunity does not turn on the subjective good faith of the defendants, but rather turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were clearly established at the time it was taken. *Harlow*, 457 U.S. at 818-19; *Mackay v. Dyke*, 29 F.3d 1086, 1094 (6th Cir. 1994). Qualified immunity is appropriate either on the basis that the right allegedly violated was not at the time "clearly established," or if "clearly established," was one that a "reasonable" person in the defendant's position could have failed to appreciate would be violated by his conduct. *Pray v. Sandusky*, 49 F.3d 1154, 1157 (6th Cir. 1995) (quoting *Anderson*, 483 U.S. at 640). Thus, even where the general rule is clearly established, it may be open to question whether the defendant's specific action comes withing the scope of the general rule. Officials may be

39

entitled to qualified immunity when their decision is reasonable, even though mistaken, in determining that their action did not fall within the scope of a clearly established general rule. *Id.* The Supreme Court urges that the lower courts follow the *Siegert* sequence and first determine whether plaintiff has alleged a constitutional deprivation at all before considering — or too readily determining — that it was not clearly established.

Plaintiffs allege that the individually named State Defendants have violated their constitutional rights through gender discrimination, conspiracy to violate their constitutional and civil rights, denial of substantive and procedural due process, and by taking Plaintiffs' property. The State Defendants argue that Plaintiffs' Amended Complaint against the individual State Defendants should be dismissed based upon the doctrine of qualified immunity because each State Defendant acted reasonably and were required by statute aud rule to: 1) investigate odor complaints concerning Plaintiffs' property, 2) inspect Plaintiffs' property, aud, 3) communicate their findings to third parties. Accordingly, the State Defendants contend that Plaintiffs' Amended Complaint against them should be dismissed as a matter of law.

To make an equal protection claim in the land use context, Plaintiffs must identify a fundamental right or suspect class, or alternatively, demonstrate a governmental action that is not rationally related to legitimate governmental objectives. *Sprint Spectrum L.P. v. City of Carmel*, 361 F.3d 998, 1003 (7th Cir. 2004). Although less than clear, Plaintiffs appear to offer the following constructions of their equal protection claim: an as applied challenge to the MDA referral and MAEAP verification process based on arbitrary and capricious disparate treatment between similarly situated businesses.

Accordingly, Plaintiffs must then prove that Defendant undertook the challenged action

with a discriminatory purpose, which requires proof that the defendant acted at least in part because of the gender of Rondigo's owner. *Barnes Found. v. Township of Lower Merion*, 982 F. Supp. 970, 984 (E.D. Pa. 1997), *rev'd on other grounds*, 242 F.3d 151 (3d Cir. 2001) (citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252 (1977)). The crucial inquiry under the Equal Protection Clause is whether the Defendant treated Rondigo differently than it treated similarly situated institutions not governed by women, and if they did, whether the Defendant did so specifically because of Plaintiffs' gender. *See Barnes*, 982 F. Supp. at 985.

In Plaintiffs' Amended Complaint, they argue that Rick Minard, a property owner in Independence Township, Oakland County, Michigan, expressed an intention to have a compost operation on his property. After Minard requested that MDA conduct a GAAMPs determination, the MDA conducted an inspection (Dkt. #48, Ex. 7). As a result of the inspection, Minard's facilities were found to be in compliance with GAAMPs. While the State Defendants maintain Minard's COP was approved because it included the management of nutrients generated through his composting operations and had developed an acceptable plan, which included soil tests and a site plan developed by an engineering firm, the Plaintiffs argue that Mindard's farm was approved for composting while there operation was denied due to gender discrimination. Plaintiff maintain that new and additional requirements were imposed on the Plaintiffs by Defendants Whitman and Mahoney, which were not imposed on other similarly situated agricultural operations which did on-farm composting (Dkt. #4, ¶¶ 117, 118, 136).

Here, Plaintiffs have articulated a cognizable, constitutional claim for violation of equal protection by alleging that the State Defendants discriminated against them in

investigations/proceedings based on their gender. The Court must therefore proceed to determine whether the contours of the right not to be discriminated against based on gender in relation to such investigations/proceedings were sufficiently clear that a reasonable official would understand that what he was doing violated that right. A court should look to prior decisional law in order to determine whether the "contours of the right" have been defined at an appropriate level of specificity. "This does not mean, however, that the 'very action in question [must have] previously been held unlawful.' Instead, qualified immunity is inappropriate where the preexisting law was sufficient to provide the defendant with 'fair warning' that his conduct was unlawful." *See Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000) (citations omitted) omitted); *Lanier*, 520 U.S. at 270-271. If so, summary judgment is unwarranted. *Schwenk*, 204 F.3d at 1195-96.

In this case, there was fair warning. It was clearly established that the Equal Protection Clause prohibited intentional gender discrimination unless it was substantially related to a legitimate government objective. *See Craig v. Boren*, 429 U.S. 190, 197 (1976). It was equally clear that a single invidiously discriminatory governmental act "would not necessarily be immunized by the absence of such discrimination in the making of other comparable decisions." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). *See also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970); *Marshall v. Kikland*, 602 F.2d 1282, 1298 (8th Cir. 1979) (holding that the right to be free of gender discrimination is clearly established, for purposes of qualified immunity analysis); *Poe v. Haydon*, 853 F.2d 418, 429-30 (6th Cir. 1988), *cert. denied*, 488 U.S. 1007 (1989) (finding that the right to be free of invidious sex discrimination at the hands of the state was clearly established); *Risbridger v.*

42

*Connelly*, 275 F.3d 565, 569 (6th Cir.2002) ("A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point"); *Oona v. McCaffrey*, 143 F.3d 473, 476 (9th Cir. 1998) (holding that "the right to be free from intentional gender discrimination by a state actor was clearly established as early as 1988").

Because Plaintiffs have (1) alleged an actual violation of their rights and (2) the contours of the allegedly violated right were sufficiently clear that a reasonable official would understand that what he was doing violated that right it is inappropriate to grant the State Defendants' dispositive motion at this time when the parties have yet to conduct discovery and discovery has been stayed by ths Court's order.  This decision does not preclude the State Defendants, after discovery has been completed, from moving for summary judgment on the basis of qualified immunity.  Without suggesting any opinion on the outcome of any such future  motion, it is noted that the State Defendants bear a much heavier burden at the pleading stage to show that they are entitled to judgment as a matter of law. *Goad v. Mitchell*, 297 F.3d 497 (6th Cir. 2002) (holding that an assertion of qualified immunity does not require the plaintiff to plead her claim with any more specificity than that required by Rule 8(a) of the Federal Rules of Civil Procedure, which requires that the complaint set forth "a short and plain statement of the claim").

Accordingly, it is **RECOMMENDED** that the State Defendants' dispositive motion based on qualified immunity be **DENIED** as to Plaintiff's equal protection claim.  It is **FURTHER RECOMMENDED** that the stay of discovery issued in this case be lifted, so that Plaintiffs can seek additional information to support this claim.

43

### 4)   Plaintiffs' Claims Of Defamation

Plaintiffs next bring a state law claim of defamation against the State Defendants.   In addition to their state law claim of defamation, Plaintiffs state that they are asserting a claim of constitutional defamation under 42 U.S.C. § 1983.  Plaintiffs contend that as part of their deprivation of Plaintiffs' property and liberty interests without due process, the State Defendants each published to others communications which had "a stigmatizing effect" at the same time that Plaintiffs were deprived of their property and liberty interests.  Citing *Mertik v. Blalock*, 983 F.2d 1353, 1363 (6th Cir. 1993), Plaintiffs argue these publications gave rise to Plaintiffs' constitutional defamation claim against the State Defendants, from which they cannot claim state immunity.

The State Defendants assert that Plaintiffs' state law defamation claim against them should be dismissed because they are each entitled to public employee immunity under MCl 691.1407(2)(C) and they were not grossly negligent.  State Defendants also argue that Plaintiffs fail to state a claim upon which relief may be granted and therefore their defamation claims should be dismissed pursuant to Fed. R. Civ. P 12(b)(6).

### State Law Claim of Defamation

To avoid dismissal, Plaintiff "must allege facts justifying application of an exception to governmental immunity . . ." *Tryc v. Michigan Veterans' Facility*, 451 Mich. 129, 134 (1996). Michigan law provides tort immunity for governmental agencies and their employees when engaged in the exercise or discharge of a governmental function.  Mich. Comp. Laws § 691.1407.  There is no dispute in this case that the State Defendants are governmental employees and that the events forming the basis for Plaintiffs claims occurred during the exercise or

44

discharge of a governmental function.  Yet, a governmental employee only receives tort immunity if he acts, or reasonably believes that he is acting, within the scope of his authority and his conduct does not amount to gross negligence that is the proximate cause of the injury or damage.  Mich. Comp. Laws § 691.1407(2).  Gross negligence "means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.* § 691.1407(7)(a). *See Tarlea v. Crabtree*, 263 Mich. App. 80, 83 (2004) ("Simply alleging that an actor could have done more is insufficient [to establish gross negligence] under Michigan law, because, with the benefit of hindsight, a claim can always be made that extra precautions could have influenced the result.").

Government employees are not shielded under the statute from liability for their intentional torts.  Mich. Comp. Laws § 691.1407(3); *Hullett v. Smiedendorf*, 52 F. Supp.2d 817, 828-29 (W.D. Mich. 1999) (quoting *Sudul v. City of Hamtramck*, 221 Mich. App. 455, 458 (1997)).  "This is because a defendant who commits an intentional tort is even more culpable than a defendant who is grossly negligent, and therefore the gross negligence exception in M.C.L. § 691.1407(2) must be read to include intentional conduct." *Hullet,* 52 F. Supp.2d at 829. Whether defendants committed intentional torts depends on whether their actions were justified by probable cause and were reasonable in response to the situation. *See Brewer v. Perrin*, 132 Mich. App. 520, 528 (1984) ("Governmental actions which would normally constitute intentional torts are protected by governmental immunity if those actions are justified. Conversely, if the actions are not justified, they are not protected by governmental immunity."). *See also Van Vorous v. Burmeister*, 262 Mich. App. 467, 483 (2004) (listing cases) (Michigan "has rejected attempts to transform claims involving elements of intentional torts into claims of

gross negligence").[13]  But note, there is no intentional tort exception to governmental immunity where the alleged tort was committed within the scope of a governmental function.  *Smith v. Dep't of Public Health*, 428 Mich. 540, 544 (1987).  Governmental employees are immune from liability for injuries they cause during the course of their employment if they are acting within the scope of their authority, if they are engaged in the discharge of a governmental function, and if their "conduct does not amount to gross negligence that is the proximate cause of the injury or damage." *Robinson v. Detroit*, 462 Mich. 439, 462 (2000).

"The elements of a defamation claim are: (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation *per se*) or the existence of special harm caused by the publication." *Mitan v. Campbell*, 474 Mich. 21 (2005).  With regard to element (2), "[a] qualified privilege extends to all communications made *bona fide* upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty and embraces cases where the duty is not a legal one but is of a moral and social character of imperfect obligation." *Frohriep v. Flanagan*, 278 Mich. App. 665, 681 (2008) (internal quotes and citation omitted).  To overcome the defendant's assertion of a qualified privilege, a plaintiff must show "that the alleged libelous publication was made with

---

[13] In *Tocco v. Piersante*, 69 Mich. App 616, 618 (1976), the Michigan Court of Appeals held that there is no governmental immunity for public officials engaged in intentional malicious conduct such as defamation.  Similarly, in *Randall v. Delta Charter Twp*, 121 Mich. App 26, 33-34 (1982), *citing McCann v. Michigan*, 398 Mich. 65 (1976), the Michigan Court of Appeals observed that the Michigan Supreme Court has "ruled that governmental immunity does not extend to intentionally tortious acts" such as intentional interference with economic relations, defamation, and slander.

actual malice, *i.e.*, with knowledge of its falsity or reckless disregard of the truth." *Id.* General allegations of malice are insufficient to make this required showing. *Hall v Pizza Hut of America, Inc*, 153 Mich App 609, 620 (1986); *Prysakv RL Polk Co*, 193 Mich App 1, 15 (1992). Moreover, "reckless disregard for the truth is not established merely by showing that the statements were made with preconceived objectives or insufficient investigation." *Grebner v. Runyon*, 132 Mich. App. 327, 333 (1984).

Under Michigan law, a plaintiff in a defamation action bears the burden of proving the requisite elements. *Bowers v Reutter*, 951 F. Supp 666 (E.D. Mich. 1997). As a threshold issue, it is the duty of the court to determine whether the statement is capable of bearing a defamatory meaning. *See Michigan United Conservation Clubs v. CBS News*, 485 F. Supp 893 (W.D. Mich. 1980), *aff'd*, 665 F.2d 110 (6th Cir. 1981). *See also Clark v. ABC*, 684 F.2d 1208 (6th Cir. 1982); *Schultz v. Reader's Digest Ass'n*, 468 F. Supp 551 (E.D. Mich. 1979); *Sawabini v. Desenberg*, 143 Mich. App. 373 (1985). In making this determination the court must decide two questions: first, whether the statement is reasonably capable of conveying the particular meaning that the plaintiff alleges the statement conveys, and second, whether that meaning is defamatory in character. *Conservation Clubs,* 485 F. Supp at 902.

Plaintiffs contend that they have set forth sufficient factual allegations in their Amended Complaint as to the false and defamatory statements which they allege the State Defendants have made (*See* Dkt. #4, ¶57; ¶58; ¶80; ¶81; ¶108; ¶130; ¶132; ¶143; ¶144; ¶145; ¶146; ¶148; ¶158; ¶162; ¶164; ¶167; ¶171;  ¶172; ¶176; ¶177; ¶194; ¶200; ¶201; ¶202). The Plaintiffs fail, however, in these paragraphs and associated exhibits to sufficiently show that the purported statements at issue had a tendency to harm (or to "defame") the Plaintiff's reputation. For

47

instance, beyond merely concluding that Defendant Whitman's March 7, 2006, letter to Defendant Superintendent Fuerstenau regarding limitations on any composting activity on the Rondigo property is false, Plaintiffs fail to indicate in what fashion Plaintiffs' reputation was harmed (*See* Dkt. #1, Ex. 4; Dkt. #4, ¶ 57).  Similarly, Defendant Seidel's alleged statement that she had personal knowledge about 400 complaints concerning Delores Michaels and her operations does not meet the defamatory definition (*See* Dkt. #4, ¶ 80).  Seidel's alleged statement is based, in part, on the exhibits attached to State Defendants' dispositive motions which reflect numerous complaints received by the State of Michigan concerning Plaintiffs' operations (Dkt. #48, Ex. 4 & 5).  The fact that these complaints may or may not have been later verified does not make them defamatory at the time Seidel's statement was purportedly made.

Whitman's alleged statements that Plaintiffs were not in compliance with GAAMPs are not defamatory simply because Plaintiffs disagree with them (*See* Dkt. #4, ¶ 81).  It is perfectly legal not to be in compliance with GAAMPs, but such action may disqualify a farmer from MAEAP verification.  In addition, despite Plaintiffs' characterization that Whitman's October 30, 2006, letter to Plaintiffs was threatening, it does not rise to the level of being defamatory in nature (Dkt. #4,  ¶ 108; Dkt. #1, Ex. 4).  Whitman's standard MDA letter does not tend to damage Plaintiffs' reputation even if Plaintiffs' characterization that the letter is threatening is accepted.  A "threatening letter" is not necessarily defamatory.

A review of Whitman's November 9, 2006, e-mail indicating that the MDA had an open odor complaint file concerning excessive odors from yard clippings on the Plaintiffs' property was neither false nor defamatory (Dkt. #1, Ex. 16).  Whitman's acknowledgment that during this time period the MDA had received a series of odor complaints regarding Plaintiffs' property

which were "open," meaning they were on going and continuous, is not only supported by the record, but most importantly does not affront one's reputation or place in the community (Dkt. #48, Ex. 4 & Ex. 5). Similarly, none of Seidel's e-mails identifying complaints about Plaintiffs constitute defamation (*See* Dkt. #1, Ex. 39).

Plaintiffs' assertions that Defendant Mahoney's statements to Michael Pratt, a farmer from whom the Plaintiffs has leased land in Armada Township as part of its compost operations plan and who is identified by name in that compost operations plan, that his compost would "pollute the ground itself and that he would not grow any crops on the land," is likewise not defamatory (Dkt. #4, ¶ 158).

As Prosser observed, a defamatory statement "necessarily . . . involves the idea of disgrace." W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 111, at 773 (5th ed. 1984). There is a distinction between statements that are merely negative and statements that are defamatory. For example, the Michigan Supreme Court has held that accusations of bad taste, bad judgment, and bias did not rise to the level of defamation. *Nuyen v. Slater*, 372 Mich. 654 (1964). At best, Plaintiffs' defamation claims against the State Defendants involve general allegations of malice.[14]

Here, the alleged defamatory statements appear to be *bona fide* and are on matters of "shared interest" among the communicants. Accordingly, these communications are protected by a qualified privilege because they were made in furtherance of the State Defendants statutory

---

[14] Moreover, since Plaintiffs specifically deny they were ever involved in composting activities for profit, they cannot claim that the allegedly published statements caused damage to their business reputation, at least as it relates to commercial composting activities (Dkt. #58, pp. 7, 53).

duty to communicate with others regarding odor complaints and Plaintiffs' compositing

operations.   As noted above, to overcome the Defendants' assertion of a qualified privilege, a

plaintiff must show "that the alleged libelous publication was made with actual malice, *i.e.*, with

knowledge of its falsity or reckless disregard of the truth." *Id.*  General allegations of malice are

insufficient to make this required showing.  *Hall v Pizza Hut of America, Inc*, 153 Mich. App.

609, 620 (1986); *Prysakv RL Polk Co*, 193 Mich. App. 1, 15 (1992).  Moreover, "reckless

disregard for the truth is not established merely by showing that the statements were made with

preconceived objectives or insufficient investigation." *Grebner v. Runyon*, 132 Mich. App. 327,

333 (1984).

In this case, Plaintiffs sufficiently plead facts which at most constitute allegations of

general malice.  As such, Plaintiffs fail to overcome their burden of demonstrating that

Defendants' statements were made with knowledge of its falsity or reckless disregard of the

truth.  Therefore, it is **RECOMMENDED** that Plaintiffs' state law claim of defamation be

**DISMISSED.**

### **Constitutional Claim Of Defamation**

Under well-settled precedent, damage to reputation alone does not implicate a protected

liberty or property interest.  *See Paul v. Davis*, 424 U.S. 693, 701 (1976).  In *Paul v. Davis*, 424

U.S. 693 (1976), the Supreme Court held that a plaintiff may not recover under § 1983 for

damages to his reputation if the alleged defamatory acts did not also result in the deprivation of a

constitutionally protected right or interest.  In *Paul*, the Louisville Police Department distributed

to local merchants a flyer that identified the plaintiff as "a person[ ] who [had] been arrested . . .

or [had] been active in various criminal fields. . . . "  *Id*. at 695.  Upon receiving the flyer, the

50

plaintiff's employer issued the plaintiff a warning and threatened to fire him if he engaged in any

misconduct.  The plaintiff then sued the police department, alleging that the defamatory

statements in the flyer "seriously impair[ed] his future employment opportunities." *Id.* at 696-97.

In rejecting the plaintiff's claim, the Supreme Court observed that "[t]he interest in reputation

alone which respondent seeks to vindicate . . .  is quite different from the liberty or property

[interests] recognized in [the Court's due process jurisprudence]."  *Id.* at 711.  As the Court went

on to explain, a plaintiff cannot recover under § 1983 for injuries to his reputation alone; the

alleged defamatory statements must also result in the deprivation of a constitutionally protected

right or interest.

> In *Mertik v. Blalock*, 983 F.2d 1353, 1363 (6th Cir. 1993), the Sixth Circuit stated:

> That the Supreme Court has narrowly construed the nature and scope of protected
> liberty interests is nowhere more evident than in *Siegert v. Gilley*, 500 U.S. 226, 111
> S.Ct. 1789, 114 L.Ed.2d 277 (1991). There the Court refused to recognize a protected
> liberty interest in favor of a clinical psychologist who resigned from employment at
> a federal hospital and who, three weeks later, was the subject of an extremely
> negative employment reference by his former supervisor at the hospital. The
> reference had the effect of foreclosing employment positions at other federal
> facilities, a loss "particularly tragic because [Siegert's] professional specialty appears
> to be one very difficult to practice outside of government institutions." *Siegert*, 500
> U.S. at ----, 111 S.Ct. at 1801 (Marshall, J., dissenting). Nonetheless, the Court
> refused to recognize the loss of the protected liberty interest because the alleged
> defamation at issue was not "uttered incident to the termination of Siegert's
> employment by the hospital, since he voluntarily resigned from his position at the
> hospital, and the letter was written several weeks later." *Id.*, 500 U.S. at ----, 111
> S.Ct. at 1794. Relying on *Paul*, the Court held that a stigma to reputation that affects
> only future employment opportunities does not give rise to a protected liberty
> interest. Because the only interest impaired was that in future employment, rather
> than an interest in employment presently enjoyed, Siegert had failed to establish the
> violation of a constitutional right. *Siegert*, 500 U.S. at ----, 111 S.Ct. at 1794.

*Siegert* thus underscores two important points: (1) a plaintiff asserting a claim for deprivation of

liberty without due process must allege the loss of a governmental right, benefit or entitlement;

and (2) the loss must occur at the same time as the claimed stigmatizing publication.

While Plaintiffs are correct that state law may not create immunity from liability under section 1983[15], as noted above, generally government officials performing discretionary functions have qualified immunity from civil damages liability in a 1983 action, "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  In other words, an official is liable only for violating rights which are "clearly established" at the time the right is violated.  *Id*. at 639.   It is not enough for a plaintiff to allege that the right to due process of law or equal protection is "clearly established" under the Fourteenth Amendment.  Instead, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized . . . sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id*. at 640.

Officials are immune unless "the law clearly proscribed the actions" they took.  *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341, 106 (1986).  "[T]o conclude that a constitutional right has been 'so "clearly established" that a

---

[15]   *See Felder v. Casey*, 487 U.S. 131, 139 (1988) ("[W]e have held that a state law that immunizes government conduct otherwise subject to suit under § 1983 is preempted . . . because the application of the state immunity law would thwart the congressional remedy . . . which of course already provides certain immunities for state officials."); *Martinez v. California*, 444 U.S. 277, 284 n. 8 (1980) ("Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 . . . cannot be immunized by state law.  A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced.").  Accordingly, the State Defendants cannot assert a claim of immunity based on a Michigan statute that shields them from Plaintiffs' constitutional defamation claim.

"reasonable official would understand that what he is doing violates that right,'" a district court

within this circuit must 'find binding precedent from the Supreme Court, the Sixth Circuit, or . . .

itself.'" *Summar v. Bennett*, 157 F.3d 1054, 1058 (6th Cir. 1998) (citation omitted) (quoting

*Cagle v. Gilley*, 957 F.2d 1347, 1348 (6th Cir. 1992)).

In *Pearson v. Callahan*, 129 S.Ct. 808 (2009), the Supreme Court receded from its

two-step sequence for resolving qualified immunity claims outlined in *Saucier v. Katz*, 533 U.S.

194 (2001). In *Pearson*, the Court stated that courts need not first determine whether the facts

alleged by the plaintiff establish a violation of a constitutional right, but rather can first address

whether or not a constitutional right was clearly established at the time.

The majority of the cases that deal with claims of defamation related to § 1983 claims are

found in the employment context where actors have taken certain actions or have made certain

statements that jeopardize a plaintiff's future employment opportunities due to a stigma that

surrounds him or her by virtue of such statements. Plaintiffs have not provided this Court, and

the Court has not found, a case that is clearly applicable or even remotely similar to the facts in

the present matter. Moreover, as stated above, this Report recommends that all of Plaintiffs'

claims against the State Defendants should be dismissed with the exception of their equal

protection claim. And Plaintiffs have failed to sufficiently demonstrate in what way Plaintiffs'

reputations have been damaged.

On these facts, it cannot be said that it was clearly established at the time of the actions of

the State Defendants that they could be held liable under § 1983 for causing possible damage to

the Plaintiffs' reputations related to statutorily required investigations and referrals to other

governmental agencies. The law did not clearly say that the State Defendants' actions would

subject them to § 1983 liability for alleged equal protection violations in the farming oversight context. As a result, the defamation claims against all the State Defendants should be dismissed under the doctrine of qualified immunity.

Accordingly, **IT IS RECOMMENDED** that Plaintiffs' claim of defamation related to their §1983 claim be **DISMISSED.**

### 5)   Plaintiffs' Retaliation Claim

In their Amended Complaint, Plaintiffs have not pled a separate and distinct retaliation count. Rather, Plaintiffs only broadly allege retaliation in violation of the First Amendment (*See,* Dkt. #4, ¶ 216). A constitutional retaliation claim has three elements:

(1) the plaintiff engaged in protected conduct;

(2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and

(3) there is a causal connection between elements one and two -- that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*). In addition, to meet the third element, "Plaintiff[s] must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct." *Smith v. Campbell*, 250 F.3d 1032, 1037-1038 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Plaintiffs can meet their *prima facie* burden using "[c]ircumstantial evidence, like the timing of events or the disparate treatment of similar individuals." *Peck v. Oakland County*, No. 07-10167, 2008 U.S. Dist. LEXIS 11693, at *21 (E.D. Mich. Feb. 15, 2008) (quoting *Arnett v. Myers*, 281 F.3d 552, 560-61 (6th Cir. 2002)). But a plaintiff is required to make more than

54

conclusory allegations of retaliation. "Merely alleging the ultimate fact of retaliation is insufficient." *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987). Conclusory allegations of retaliatory motive "with no concrete and relevant particulars" fail to raise a genuine issue of fact for trial. *See Salstrom v Sumner*, No. 91-15689, 1992 US App. LEXIS 7911, 1992 WL 72881 at *1 (9th Cir. April 10, 1992). Yet, "if the plaintiff meets this burden, the burden of production shifts to the defendant, but if the defendant can show he would have taken the same action in the absence of the protected activity, he is entitled to summary judgment." *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 586 (6th Cir. 2008) (internal citation omitted) (citing *Thaddeus-X*, 175 F.3d at 399).

Here, Plaintiffs' complaint, beyond merely concluding that Plaintiffs are victims of retaliation, does not meet any of the requirements for a *prima facie* claim of retaliation. First, there are no allegations in Plaintiffs' comprehensive Amended Complaint indicating that Plaintiffs engaged in any protected conduct. *Thaddeus-X* 175 F.3d at 394. There are no claims in their Amended Complaint that an adverse action was taken against Plaintiffs that would deter a person of ordinary fitness from continuing to engage in that conduct. *Id.* Most importantly, Plaintiffs' Amended Complaint fails to indicate that the adverse action was motivated, at least in part, by the Plaintiffs protected conduct. *Id.*

In Response to the present motion, Plaintiffs state, "The allegations in (sic) Amended Complaint show that the Rondigo plaintiffs were engaged in constitutionally — protected activities — operation of their farm and insistence that Moving Defendants comply with the governing law and statutes when dealing with them." (Dkt. #58, p. 56). Yet, Plaintiffs' farming operation or purported insistence that the State Defendants comply with the law fails to satisfy

55

the first element of a *prima facie* First Amendment retaliation claim.  Farming and related agricultural activities are not constitutionally protected speech.

Plaintiffs have failed to show there was any adverse action taken by the State Defendants that would cause Plaintiffs to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in any constitutionally protected activity.  *Thaddeus-X*, 175 F.3d at 388.  Plaintiffs speculate that the State Defendants retaliated against them because they obtained admissions at evidentiary hearings, but other than in the present case, none of the State Defendants were made formal parties to any lawsuits dealing with Plaintiffs.  Plaintiffs, in their Response to the State Defendants' dispositive motion, have done nothing more than inject conclusory allegations and speculation in order to sustain their retaliation claim.

For these reasons, IT IS RECOMMENDED that Plaintiffs' claim of retaliation against the State Defendants be DISMISSED pursuant to Fed. R. Civ. P. 12(b)(6).

## III.   RECOMMENDATION

For the reasons stated above, it is RECOMMENDED that Defendants' dispositive motion be GRANTED IN PART AND DENIED IN PART, and that Plaintiffs be allowed to proceed against the State Defendants only on their equal protection claim.  The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the

56

objections a party might have to this report and recommendation.  *Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.  A party may file a reply brief within 5 days of service of a response.  The reply shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.

Dated: March 31, 2009                     s/Steven D. Pepe
Ann Arbor, Michigan                       United States Magistrate Judge

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2009 , I electronically filed the foregoing paper with the Clerk of the Court using the E.C. F. system and or US Mail which will send notification of such filing to the following.

s/Jermaine Creary
Courtroom Deputy Clerk
U.S. District Court
600 Church St.
Flint, MI 48502
810-341-7850

57

pete__peltier@mied.uscourts.gov